# In the United States Court of Federal Claims

Nos. 99-197T

(Filed: April 24, 2006)

---

| | | |
|---|---|---|
| NEW DYNAMICS FOUNDATION, | * | Motion for declaratory relief under section 7428 of the Internal Revenue Code; Tax-exempt status under section 501(c)(3) of the Code; "Donor-advised" foundation; Standard of review in declaratory judgment actions – *de novo*; Whether the court may determine that plaintiff is exempt as of some date other than the date of its application; Content of administrative record; Foundation and related donor foundations not "operated exclusively" for exempt purposes; Exemption denied. |
| Plaintiff, | * | |
| v. | * | |
| THE UNITED STATES, | * | |
| Defendant. | * | |

---

**OPINION**

---

*R. Todd Luoma*, Sacramento, CA, for plaintiff.

*W. C. Rapp*, U.S. Department of Justice, Washington, D.C., for defendant, with whom was *Assistant Attorney General Eileen J. O'Connor.*

**ALLEGRA, Judge:**

"[C]harity begins at home, and justice begins next door."[1]

New Dynamics Foundation (plaintiff or NDF) brings this declaratory judgment action under 26 U.S.C. § 7428(a), seeking a declaration that it is exempt from taxation under sections 501(a) and 501(c)(3) of the Internal Revenue Code of 1986 (the Code). After careful consideration of the parties' briefs and other submissions, review of the certified administrative record, and oral argument, the court finds plaintiff is not entitled to the relief it requests for the reasons set forth below.

---

[1] Charles Dickens, *Martin Chuzzlewit* ch. 27 (1844). The first part of this proverb is attributed to the Roman comic playwright Terence (about 190-159 BC).

## I. FACTS

Based upon the administrative record in this case, the court finds as follows:

### A. Background

On or about May 11, 1996, NDF filed its initial application with the Internal Revenue Service (IRS) seeking tax-exempt status. It resubmitted its application following its formal incorporation as a California corporation. On October 2, 1996, the IRS indicated that it was disinclined to grant plaintiff's application based upon the information it had received to date, and requested additional information. On October 16, 1996, plaintiff responded to the request. Ultimately, on January 29, 1998, the IRS sent plaintiff a proposed final adverse determination letter in which it denied plaintiff's application for tax-exempt status. Following a protest, the IRS issued a final ruling denying the application on January 20, 1999. The final ruling stated that NDF did not qualify as an exempt entity because it failed to establish: (i) that it was operated exclusively for purposes described in section 501(c)(3) of the Code; (ii) that its net earnings would not inure to the benefit of private individuals; and (iii) that more than an insubstantial part of its activities would further private purposes rather than purposes described in section 501(c)(3). On April 5, 1999, plaintiff filed suit in this court seeking a declaratory judgment that it is exempt from federal income taxation under section 501(a) of the Code, as an organization described in section 501(c)(3) of the Code.

### B. New Dynamics Foundation: Its Origins and Operations

Plaintiff was formed on or about May 11, 1996, and initially operated as a "sub-account" under a tax-exempt organization, the National Heritage Foundation (National Heritage). Plaintiff eventually was spun off from National Heritage, by its account, as a West Coast version of the latter organization. As noted, plaintiff filed its application for tax-exempt status on or about May 11, 1996. The application was returned because plaintiff was not yet an incorporated entity under state law.

#### 1. Basic Governance

On June 17, 1996, plaintiff incorporated as a California nonprofit public benefit corporation. Its incorporator and founder was Robert Henkell (Henkell), who was also NDF's first president and chairman of the board. Plaintiff's initial board of directors included Henkell, Allen Sainsbury, William L. Sefton, and four other individuals, each of whom had previous business relationships with Henkell.

Article II of NDF's articles of incorporation sets forth the purposes of the corporation, among which was "[t]o promote and or contribute to charitable causes which serve the public good . . . as defined in Section 170(c) of the Internal Revenue Code," adding that "[s]uch objectives may be met independently and by working with other tax exempt organizations since many 501(c)(3) organizations have similar objectives as ours under Section 501(c)(3) of the

Internal Revenue Code." The Articles, in terms later echoed by NDF's bylaws, further provided that "no part of the net income or assets of the organization shall ever inure to the benefit of any director, officer, or member thereof or to the benefit of any private person." They concluded by indicating that "[t]he property of this corporation is irrevocably dedicated to charitable purposes," indicating that upon dissolution, the corporation's remaining assets would be distributed to a tax-exempt organization.

According to an August 25, 1996, letter submitted to the IRS, the Board of Directors of NDF initially identified "as areas of activity and focus" during its first year of operation: (i) "promot[ing] the education of students in computers" and in "entrepreneurship;" (ii) "provid[ing] support to prison ministries" and to "groups that provide drug and alcohol abuse education;" and (iii) providing support to "animal rights organizations" and "groups and organizations that work for the conservation and preservation of forest lands and wildlife management." Other documents indicate that NDF planned to work with financial and tax professionals to establish accounts for individuals, who, over time, could direct the use of those funds for alleged charitable purposes. In various promotional materials, plaintiff touted that "[m]oney, investments and other property within a public charity grow tax-free, not tax deferred," and that "[s]ince growth within a public charity is tax FREE, not tax deferred, effort should be made to earn a fair return within prudent risk parameters." On September 17, 1996, the State of California granted plaintiff tax-exempt status.

Plaintiff's October 16, 1996, letter responding to an IRS information request, which was accompanied by promotional literature, described the operation of the donor accounts in the following terms –

> When a person wishes to contribute to NDF they simply make a contribution in the normal manner of writing a check or donating property. NDF will use this money on any of the many projects NDF is involved in itself. However, if the donor wishes to direct the funds for a specific purpose or project, the following steps occur:
>
> A. A separate account is set up using the donor's contribution.
>
> B. An Advisory Committee is established over that account. The NDF Board of Directors establishes each Advisory Committee with at least three members of legal age. The Advisory Committee for each separate donor-directed sub-account reports to the NDF Board of Directors and must obtain Board approval for all actions. The donor is welcome to suggest two members of the Committee,

> including the donor, if desired.[[2]] NDF will always appoint at least one of the Committee members. The committee does not control funds. They make recommendations to the main Board of Directors. . . .[[3]]
>
> C. The Committee will make recommendations to the Board of Directors as to the use of the funds. The Board will pay special attention to be sure the Committee recommendations are in compliance with IRC 501(c)(3). Any recommendation must be accompanied by sufficient details to allow the Board adequate review. . . . All new recommendations or other changes must have NDF Board approval. Since only the Board of Directors of NDF controls the "purse strings" the project cannot get started without Board approval. Donors do not control actual monies once monies have been gifted to NDF. The Committee can only make suggestions to the Board of Directors

The letter indicated that, as of that date, $307,539.76 had been donated to NDF through 43 donor-directed sub-accounts, of which $20,258 had been used directly in Board-approved charitable activities.

---

[2] The promotional materials indicated that "[e]ach Donor has the opportunity to appoint an Advisory Committee to initiate investment choices and charitable project expenditure actions." Moreover, the individual donor could change the make-up of the Advisory Committee by submitting a request to NDF's Board, a process that promotional materials indicated "provides the Donor the opportunity to 'pass on' the membership from one generation to the next" and to "increase the Committee size to include additional family members." The materials further stressed that "[f]or proper operation of the donor-directed aspect of NDF, it is important that the Advisory Committee be managed by the Donor, using Donor energy and imagination."

[3] Regarding these points, NDF's promotional materials stated –

> It is very important to note that all contributions to the individual donor-directed foundations are the property of NDF. Assets do not belong to the Donor or to the Donor's family. Donor-directed does NOT mean donor-owned or donor-controlled. Title to all assets will be changed to New Dynamics Foundation. Although all sub-accounts will be segregated from all other sub-accounts, NDF will be the titled owner. Each sub-account will have separate bank accounts, investment accounts and any other separate partitioning of wealth that seems necessary and possible. No charitable funds will be co-mingled between donor-directed sub-accounts or into any NDF operational account or NDF money market fund. However, NDF will have the sole signature authority for all accounts and total legal ownership of all contributed wealth.

According to the protest, as well as accompanying materials, plaintiff charged several "fees" for creating and managing the sub-accounts. There was an initial "set-up fee" of $2,500, which was paid on a sliding scale out of the first $7,000 of each donation and a "management fee" of 0.625 percent of the account balance per quarter purportedly to cover NDF's general operating expenses and overhead.[4] When initially established, plaintiff entered into oral agreements with two "financial marketing companies" – Estate Preservation Services (EPS) and Washington Financial, Inc. (WFI) – to solicit contributions from potential donors. In exchange for those solicitations, plaintiff paid a percentage of each $2,500 set-up fee to the referring marketing company as a commission – 40 percent (or $1,000) to EPS, and 34 percent (or $850) to WFI. As between the two companies, the vast majority of commissions apparently went to EPS, which received $17,529.20 from the first 43 donors, compared to $375.70 received by WFI. The record reflects that Henkell founded EPS and was the original incorporator. In its October 16, 1996, letter, however, plaintiff asserted that neither Henkell nor any member of his family currently owned any interest in EPS. Other documents in the record suggest that EPS, at some point, was sold to another company, The Wealth Protectors, Inc. (TWP). The nature of Henkell's relationship with TWP is disputed.[5]

Various documents explained how individual foundation assets could be expended. As described in greater detail below, under the specified process, the advisory committee of the individual foundations made recommendations to the NDF Board. Regarding this process, the "Operation Manual" (the Manual) supplied to donors emphasized that "[f]unds donated to a specific donor-advised foundation are to be used in that end." The Manual listed, as examples of charitable uses, a range of religious, educational and general welfare projects. But, it noted that "it is just as important to realize that charitable use which is normally non-taxable, can also benefit the Donor or the Donor's family." By way of example, it stated that "if the Donor's child did volunteer work at a local hospital, the foundation could pay that child a reasonable 'wage' for participating in the 'volunteer activity.'" In this regard, it observed "[a] direct charitable expense usually carries no income tax consequences to those involved or to the recipients," adding that "[s]ure, 'wages' for a charitable act are taxable but grants and fellowships usually are not." At a later point, it reemphasized – "[a]gain, just because a use of foundation assets is for a charitable

---

[4] Promotional materials indicated that "[f]or smaller accounts (under $10,000 contributed), the management fee is the actual investment return on the donor-directed charitable sub-account assets." Conversely, the promotional materials indicated that once the account reached certain designated benchmarks, the amount of the management fee would be reduced (*e.g.*, at an account value of $1 million it would be 0.5625 percent per quarter; at $5 million or over, it would be 0.4375 percent per quarter).

[5] At its inception, NDF contracted with another organization, Omni Estate Services, Inc. (OES), to cover its rent and other start-up costs in exchange for 30 percent of the NDF set-up fee and 50 percent of the ongoing quarterly management fees. Like EPS, OES was solely owned by Henkell. In June of 1997, Henkell sold OES to an "attorney group;" the nature of Henkell's relationship with OES following that sale is disputed. Plaintiff later terminated its relationship with OES.

purpose does not mean that the Donor, the Donor's family [or] any other designated person can't also benefit and be paid for participation."

The Manual provided extensive directions as to how donors might use funds for what were termed "administrative expenses." Thus, it stated that "NDF understands that the operation of any charitable endeavor requires administrative expenses," noting that "[t]o that end, each donor-directed foundation's Advisory Committee will have the opportunity to recommend administrative expenditures as well as charitable expenditures." Later, the Manual opined that "[r]easonable administrative expenses are always an acceptable use of foundation money." For example, a donor could seek –

> reimbursement of expenses ranging from "office supplies" for foundation operation to gas mileage costs for travel in support of foundation goals or activities. Requests can be made in advance to "fund" a foundation meeting, including airfare and lodging, or to simply repair or improve a foundation-held asset.

It later indicated that "[r]easonable administrative expenses might include paying the Donor or a member of the Donor's family a fee or wage to attend a meeting or to 'research' an investment or to provide advice and direction – be a consultant."

At several seminars that he conducted in April 1996, Henkell indicated that "ninety-five percent" of the money contributed to a charity could be used for administration, noting, in particular, that such foundations could be used to pass "ninety-five percent" of life insurance proceeds to children. Henkell highlighted the other supposed advantages of having a charitable foundation as compared to an individual retirement account (IRA): (i) no minimum age for taking money out and no requirement that money be taken out at age 70½; (ii) "easier to direct where your investments go;" (iii) a charitable foundation is never a part of an estate and its assets are unlikely to be seized, particularly by the IRS; and (iv) "zero" tax rate on the charitable foundation which can be taken over by family members. Consistent with these claims, an EPS newsletter, dated June 1996, emphasized that the foundations were "a very powerful long range planning device to establish, tax-free, a nest-egg that can provide retirement benefits and some great opportunities for charitable projects."

NDF's promotional materials provided further insights into its operations. One brochure, entitled "Warehousing Wealth!," listed the following "potential uses of a public charity!" –

> 1. INCOME REDUCTION: Use an NDF public charity account to warehouse income for long range planning and wealth accumulation. Remember, a Trust can donate, and deduct, up to 100% of Trust income to a public charity.
>
> 2. CAPITAL GAINS AVOIDANCE: Use an NDF public charity account directly, or indirectly through a Charitable Remainder

Trust, to receive an asset prior to sale to avoid any capital gains taxes. This can also eliminate a "mortgage over basis" or debt forgiveness problem.

3. ESTATE SIZE REDUCTION: Use an NDF public charity account to reduce the size of an estate prior to estate taxation. This can eliminate estate taxes (or have the Government donate up to 55% to your family foundation).

4. CHARITABLE PROJECTS: Use an NDF public charity account to build wealth for a special project. This includes scientific grants, religious projects and educational scholarships.

5. LIABILITY PROTECTION: Use an NDF public charity account to provide liability protection for an asset. This can protect an asset from seizure by most creditors in most debt or lawsuit situations. This can also include some level of protection prior to a bankruptcy.

6. MEDICAID PAYDOWN RELIEF: Use an NDF public charity account to receive assets prior to a long term care situation and a potential Medicaid paydown.

7. TRANSFER OF QUALIFIED RETIREMENT PLANS: Use an NDF public charity account to receive withdrawals from a qualified plan. This includes 401(k), SEP, SARSEP, KEOGH, TSA's or 403(b), and IRA plans. A client can withdraw (even avoiding a 10% penalty if done regularly over at least 5 years) funds (taxable income) and make a charitable contribution to the family NDF account (charitable writeoff). Up to 50% of the adjusted income can be written off in the year given. (Keep planned withdrawals equal to net income and it can all be written off when placed in the NDF account).

Summing up these perceived advantages, Henkell indicated at one of his seminars that "[w]ith a charity, wealth goes tax-free and contributions are tax deductible."

**2. Donor Investment and Expenditure Requests**

The advisory committee for each individual foundation was authorized to make recommendations to NDF's Board of Directors for investment of donated funds (or the sale of donated property and reinvestment of the proceeds). In fact, expenditure requests under $25,000 were ordinarily acted upon by only one member of the NDF Board, sometimes Henkell himself. Despite indicating in its brochure that "[i]t is not proper for a public foundation to hold property

or assets that . . . do not generate income," the NDF Board approved requests authorizing certain foundations to receive or purchase non-income assets. For example, it approved the purchase of over $150,000 in collectible coins (some of which were apparently sent directly to the donor), authorized another donor to transfer a Mexican vacation time-share to his foundation, and allowed various other foundations to purchase life insurance or annuity contracts that did not generate income streams. In some instances, these assets were virtually the only asset held by the respective foundation.

NDF approved a variety of expenditures to what appear to be recognized section 501(c)(3) organizations. Plaintiff claims that in its first year of operation, it distributed $97,313 to such organizations, corresponding roughly to 4.2 percent of the $2,249,089 that had been contributed as of January 1997.

Some details regarding the approval of expenditure requests may be found in a June 5, 1997, letter from Henkell to the IRS. In response to the IRS' question – "Do you have meetings concerning requests from donors?," Henkell responded –

> Each donor request must be approved. This constitutes the "record" and action of the directors. For amounts over $25,000, at least 4 directors were involved. A summary of requests were presented and reviewed at the January Board of Directors meeting and another summary will be presented at the July Board of Directors meeting.

Henkell further stated that "NDF does not allow distributions of charitable funds to any donor, even if requested," but later indicated that "NDF does accept requests for donor-involved charitable activities" and that "[n]o NDF donor who has an NDF sub-account can ever receive pay unless actual charitable functions are served." Asked whether NDF had ever turned down a donor's request to make a distribution, Henkell listed four such instances – a couple that wanted to use charitable funds for a trip to Hawaii; an individual who wanted reimbursement for a trip to Napa Valley to study winery stock as an investment for charitable funds; an individual that wanted to use charitable funds for her child's education; and a donor that asked for checks to be made out to a school and delivered directly to him.

Over time, NDF denied other requests for various reasons, such as a lack of charitable purpose or a failure to document needed expenditures. In some situations, however, it appears that checks for the same activity instead were later sent directly to a charity or non-profit institution, begging the question whether the payments were viewed by the recipient as a donation or as paying for specified services for the individuals previously named in the request. Tending toward the latter view, on several occasions, instructions were given to have checks issued with references to the donor or particular members of the donor's family, making it appear that the expenditure were for personal purposes. In other instances, requests that were denied were only slightly revised and then approved – for example, in several instances, requests were modified to have checks sent directly to the sellers of specified products rather than to the

donors; in another, a request for home schooling expenses was denied, but over $2,900 was later paid to the "Home Church" for home-schooling materials.[6]

Other requests that were approved bore the distinct mark of personal expenditures. In one of his promotional lectures, Henkell provided the following telling example –

> Mr. Henckle:[7] I have one person right now with a charity who truly does some inner – inner-city free medical work. I have a – a doctor who's seventy-three years old, lives down in Arizona. We've been working with him as a charity for a number [of] years. We got him in a private charity a long time ago.
>
> He's chunked away a lot of money in his charity. Now he travels around the Southwest and works especially with the Indians, and he does some free medical work.
>
> And basically he just likes going around visiting with the Indians. He doesn't do anything real heavy medically, but he had to have a motor home to do it. Paid a hundred and forty-seven thousand dollars for a motor home. This is the most beautiful executive motor home out of Inglewood that I've ever seen in my life. It has everything. [I]t's 43 feet long. I mean this sucker – this sucker is superb.
>
> Who bought the motor home?
>
> Voices: Charity.

---

[6] Commenting on such situations, Henkell explained during one of his lectures that –

> If you came in . . . with something that said you wanted to visit thirty cities in thirty days, in four weeks, for ten minutes a day, the board of directors here would not approve it. We'd work with you to find another way to get the job done, but we couldn't – we couldn't approve it.

He added – "[a]nd we have two right now that we're trying to find different ways to what they word it [sic]."

[7] Henkell's name was misspelled throughout this transcript. However, a number of the claims in this transcript are similar to those he made at other times, leaving the court with little doubt that it was Henkell, and not some other individual named "Henckle," who was speaking. Moreover, when first presented these transcripts, NDF admitted to the IRS that they were "excerpts from a transcript of an Estate Preservation Services (EPS) seminar held 4/26/96 - 4/27/96 by Mr. Henkell . . . ."

Mr. Henckle: The charity. Is that taxable income to him?

Voice: No.

Mr. Henckle: Who buys the gas? Charity.

At another lecture, Henkell listed among the purposes to which money donated to a foundation could be directed – taking money for "an emergency in your life," to educate someone, and to fund a scientific study by the donor, such as "studying the canal systems of Peru." In another such lecture, he suggested that donors could go to a college financial aid office and ask whether the college would assist the donor's child if a donation were made to the college, noting that NDF would take a "[d]on't ask, don't tell" approach to such requests.

Various promotional materials reinforced these claims. Thus, the Manual indicated that "if the Donor's child did volunteer work at a local hospital, the foundation could pay that child a reasonable 'wage' for participating in the 'volunteer activity.'" A June 1996, EPS newsletter assured, in similar vein, that "[w]hen, and if, money is needed, the public charity can 'hire' the donor for management or consulting purposes" and that "[t]his warehoused wealth can also provide scholarships and grants." And other promotional materials indicated that suggested benefits also included, but were not limited to scholarships for the benefit of family members, avoiding estate taxes, avoiding capital gains taxes, and "paid" volunteer work. Still other promotional material stated that donors could "build a large charitable foundation to provide continued income during retirement years."

Consistent with these representations, the record includes documentation of various questionable expenditures that NDF approved, involving such things as: (i) $4,130 to allow two members of an advisory committee to attend a religious retreat; (ii) approximately $1,600 to cover the travel, lodging and food expenses of two members of an advisory committee who attended a world conference on evangelism and a marriage seminar; (iii) approximately $3,470 to allow donors to attend an "elder" conference; (iv) over $300 to provide salary to foundation members' children working at an AIDS center; (v) various requests to cover the costs of donors attending seminars taught by Henkell, as well as "training classes" provided by EPS and NDF; (vi) approximately $1,200 for expenses associated with providing meals, entertainment and gifts to individuals of Chinese descent, purportedly in support of evangelization efforts, with some of these expenses relating to dinners held at the advisory board member's house; and (vii) $216 to cover a rental car and other expenses of advisory committee members seeking to provide support to a nephew who had bipolar depression and a recently-divorced niece, as well as to visit a student at a college who had "stalking problems" with a fellow student. Records reveal that NDF also approved, virtually with no documentation, thousands of dollars of expenditures for "administrative" expenses and "fundraising."

### 3. The Role of Henkell

The parties dispute most of the details relating to Henkell's past and current association with plaintiff and the roles of other entities owned or controlled by him and his family. Plaintiff

does not contest – and the record confirms – that early in NDF's life, Henkell dominated its operations. Various documents suggest that Henkell and his wife resigned from their respective positions at NDF on or around June 30, 1997. Initially, Henkell was replaced by Scott Grace. On September 15, 1997, Allen Sainsbury then became the Chairman of NDF's Board of Directors and its President. In a letter to the IRS, dated November 21, 1997, Sainsbury emphasized that "[a] clear distinction needs to be recognized between NDF and Mr. Robert Henkell." Referring to many of the materials quoted above, Sainsbury noted that "[m]uch of this material was written or spoken by Mr. Henkell in the capacity of a marketer with a definite sales spin," and emphasized that, following Henkell's resignation, significant modifications had been made "to the written material that is currently being used with the general public." Sainsbury attached the revised materials to the letter and, indeed, the revised brochures (dated September 26, 1997) excluded much of the language that had previously suggested that Foundation moneys could be used to fund personal expenses and activities. Nothing in the record, however, indicates whether and when plaintiff communicated these changes to its preexisting donors.[8]

When asked by the IRS for hard evidence that new officers and a board of directors had been appointed (*e.g.*, letters of resignation, minutes, or resolutions), neither Sainsbury nor any other representative of NDF were forthcoming. At least several of the new board members were former agents of EPS and the newly-formed board met at Henkell's house after his resignation. NDF attempted to demonstrate that it was no longer affiliated with Henkell by providing the IRS with a list of the entities paid for fundraising/field support that reflected no NDF payments to any of Henkell's entities. But, the record reveals that NDF made payments to American Legal Services, an entity related to Henkell, in August, October and November of 1997, and at various points during 1998. Further, the record suggests that, even after Henkell's alleged departure, NDF continued to use, at least at times, the original versions of its promotional material, and not the revised versions that had been provided to the IRS. Still other evidence, particularly testimony given by Sainsbury in a case involving EPS and OES, indicates that he often was a figurehead for entities that were actually controlled by Henkell.

On June 30, 1997, defendant filed a complaint for permanent injunctive relief against EPS (both as a trust and corporation), Henkell and others, seeking to enjoin them from participating in organizing, selling or assisting in the promotion of establishing charities based upon the false representation that individual taxpayers could essentially shelter income in such charities, characterizing this as among several "abusive tax shelters, plans or arrangements" in

---

[8] A "Procedural Review" prepared by an outside attorney for the NDF Board shortly before Henkell left indicated that, early in 1997, donors of new accounts were required to complete a disclosure form that emphasized, *inter alia*, that the donors and their families could not benefit from the donor-advised foundation "through loans, grants, scholarships or other forms of self-inurement." The report, however, stated that the forms did "not exist for the older accounts, which at this time makes up the majority." While the report recommends that the donors of older accounts should complete "a disclosure checklist," there is no indication that this recommendation was ever adopted or effectuated.

which they were involved. *See United States v. Estate Preservation Services*, CIV-S-97-1166 (E.D. Cal.). The complaint averred that Henkell had, during seminars, falsely claimed that "individual taxpayers can set up their own charities to improperly amass assets tax free and to hide money from the Internal Revenue Service." In an order, *see United States v. Estate Preservation Services,* 38 F. Supp. 2d 846 (E.D. Cal. 1998), *aff'd*, 202 F.3d 1093 (9th Cir. 2000), the district court noted that the NDF promotional materials had made "false" statements "that an individual can use a charitable foundation to disburse funds back to the donor or the donor's family," noting that such statements were "not supportable under the Internal Revenue Code. *Id*. at 854.[9] Ultimately, the district court enjoined Henkell, EPS, and several former officers and board members of NDF, including Sefton and Grace, from promoting abusive tax avoidance transactions. That injunction, however, did not extend to NDF. Nonetheless, the order clearly referred to NDF's role in Henkell's promotion of "a tax scheme that contradicted fundamental tax principles and specifically advocated the use of deductions not allowable under the Internal Revenue Code." *Id*. at 856.[10]

### C. The IRS Rulings

On January 29, 1998, the IRS issued a proposed final adverse determination letter denying plaintiff's application for tax-exempt status. The extensive ruling began with a summary of what the IRS believed were the facts surrounding NDF's formation and operation, highlighting some of the same materials quoted above. The ruling made various findings, among them that –

> – While your Articles of Incorporation provide that you are organized for charitable purposes, your activities have demonstrated that you are not operated exclusively for charitable purposes . . . . You aggressively market, and have permitted others to aggressively market, your services as part of a classic tax scheme. You have provided information to your "contributors'" which clearly misstates settled principles of tax law. In particular, you have advised your "contributors" that money placed in one of your subaccounts can and should be used for the "contributors"

[9] The district court likewise concluded that other members of NDF's Board Directors had participated in disseminating fraudulent information regarding tax benefits, including "the use of the NDF Brochure which contained fraudulent representations regarding donor-directed foundations." *Id*. at 858. The Ninth Circuit specifically upheld this portion of the district court's order. *United States v. Estate Preservation Services*, 202 F.3d at 1102.

[10] In connection with that case, but prior to its resolution, the United States levied on the assets of two financial institutions held in the name of plaintiff, claiming that Henkell was so in control of NDF as to make the foundation essentially his alter ego. Plaintiff brought suit against the United States in August of 1997, *New Dynamics Foundation v. United States*, Case No. CIV-S-097-1437 (E.D. Cal.), claiming that the levies were unlawful. This matter was later settled, with defendant withdrawing the levies it had served on NDF's various accounts.

> personal benefit. You have gone beyond mere advice, you have set up the subaccounts in a way that provides the donor with control over the funds. While you stated to the Service that all funds belong to you and that you have control over their use for charitable purposes, in operation this is not the case. Your "contributors" control their individual accounts. . . . In many cases, such as expenditures for personal medical costs, for entertainment expenses, for personal educational expenses, your "contributors'" directions have not resulted in a bona fide charitable contribution.
>
> – The information submitted in the file indicates that you are operating for the private benefit of your donors, your directors and the agents of the for-profit organizations aggressively marketing your services. Evidence that you are operating for your donors' private interests is based upon the aggressive marketing of your subaccounts. The for-profit organizations induce owners to establish subaccounts by presenting benefits of an income tax deduction, a lower estate for determination of estate tax, the right to retain control over their contribution by being able to recommend how funds are to be invested, and the right to "appoint" who will be able to make advisory decisions in the event of a donor's death.
>
> – Based on the information in the file you are organized and operated for the benefit of your directors, and in particular Mr. Henkell. Evidence showing that you are operating for the benefit of Mr. Henkell is that you were created by Mr. Henkell, and all fees are passed to organizations controlled by him (EPS, OES). . . . [Y]our net earnings are inuring for the benefit of Mr. Henkell, donors, and agents of the for-profit companies. Mr. Henkell receives a percentage of the set up fees through his for-profit companies without a capped amount. Some earnings inure to the benefit of the agents through the open ended commission agreements, whereby each agent receives a yearly fee for their life and their heirs for each account established. Your earnings inure to the benefit of your donors because several donors establish accounts through their own contributions and receive some of their contributions back in the form of reimbursements.

Finally, this ruling rejected the notion that plaintiff was operating differently after Henkell resigned, finding – "You have not provided sufficient information to show that you are now operating for exempt purposes within the meaning of section 501(c)(3). In fact, other than providing names of new directors, you have not indicated any change in your method of

operation. You have not renounced any of your methods or tactics or provided new information for us to consider." The IRS concluded: "[a]ccordingly, you do not qualify for exemption as an organization described in section 501(c)(3) of the Code . . . ."

On February 12, 1998, counsel for NDF requested additional time to protest the preliminary denial. He indicated that he believed that "many of the difficulties the Foundation is currently facing in connection with this filing are attributable to bad advice and counseling by other professionals and that the New Dynamics program and operations can be conducted in a manner that clearly falls within the requirements and constraints of a section 501(c)(3) organization." On March 27, 1998, plaintiff provided additional documentation to the IRS (*e.g.*, resignation letters from some of the prior board members and minutes of several board meetings), but refused to provide other documents that had been requested (*e.g.*, certain declarations under penalty of perjury). This response also emphasized various changes that plaintiff had made in its operations following the filing of its application and the severance of its relationship with Henkell and his web of organizations.

Plaintiff requested a conference to discuss the matter, which meeting apparently occurred on July 24, 1998. On October 13, 1998, plaintiff's counsel wrote the IRS, summarizing resolutions adopted by NDF's Board of Directors (copies of which were attached to the letter) that eliminated both the use of third-party marketers paid by commission and of advisory committees for sub-accounts. The resolutions indicated that in the future donors would make requests for investment or expenditure of funds directly to NDF's Board of Directors. The letter also suggests that plaintiff had eliminated the use of separate checking accounts to hold and disburse funds for each individual foundation. On January 15, 1999, counsel for plaintiff provided the IRS with additional information, commenting, in particular, on testimony that had been given by several individuals, including Henkell, in the district court injunction proceeding.

As noted, on January 20, 1999, the IRS issued a final adverse ruling denying NDF's application for tax-exempt status. This ruling succinctly concluded that –

> You have not shown that you are operated exclusively for one or more exempt purposes. You have not shown that you are not more than incidentally serving private rather than public interests. You have not shown that your earnings do not inure to private shareholders or individuals.

It noted that NDF could contest the IRS' decision under the declaratory judgment provisions of section 7428 of the Code.

**D. The Proceedings to Date**

On April 5, 1999, plaintiff, indeed, filed a complaint in this court seeking a declaratory judgment under section 7428 that it is tax-exempt under section 501(a) of the Code by virtue of its compliance with section 501(c)(3) of the Code. On October 25, 2000, the court issued an

order staying the case to allow for settlement discussions. For several years the parties urged the court to continue the stay. Ultimately, when a settlement did not materialize, the court restored the case to its active docket. Per order, defendant filed the administrative record in this case on May 17, 2004. Following a round of motions addressing plaintiff's objections to the inclusion of certain items in the record, revisions to the record were filed, with the last corrected volume filed on September 8, 2004.

On August 12, 2004, plaintiff filed its motion for declaratory judgment. On January 10, 2005, defendant filed its cross-motion for judgment. On March 3, 2005, plaintiff filed its response brief, and on March 18, 2005, defendant filed its reply. Oral argument on the cross-motions occurred on June 6, 2005. Thereafter, the court received supplemental briefing on two key issues: (i) what standard of review is to be applied in determining whether a declaratory judgment is appropriate in an action filed pursuant to section 7428 of the Code, and (ii) whether the court, acting under section 7428, could issue a declaratory judgment that plaintiff was tax-exempt as of a specified initial qualification date other than the date of plaintiff's initial application for tax exemption.

## II. DISCUSSION

Plaintiff seeks a declaration that the IRS wrongly denied its initial application for exempt status, arguing that the facts do not support the refusal to grant it tax-exempt status. It asserts that defendant is carrying out a "vendetta" against Henkell. Defendant replies that the IRS' decision to refuse tax-exempt status to plaintiff was valid, both because plaintiff failed to meet the "operational" requirements of section 501(c)(3), and because plaintiff is "part of a larger abuse tax avoidance scheme" that has produced private inurements.

### A. Preliminaries

Section 7428(a) of the Code provides that "[i]n a case of actual controversy involving" a determination by the Secretary "with respect to the initial qualification . . . of an organization as an organization described in section 501(c)(3) which is exempt from tax under section 501(a) or as an organization described in section 170(c)(2)," this court may "make a declaration with respect to such initial qualification."[11] Notably, there is a difference of opinion as to the standard of review to be applied in such cases. The D.C. Circuit, as well as this court, have held that *de novo* review applies,[12] while the Fifth Circuit has employed something akin to arbitrary and

---

[11] Section 7428 was enacted as part of the Tax Reform Act of 1976, Pub. L. 94-455, to create a preenforcement judicial review mechanism for exemption decisions. *See* H.R. Rep. No. 94-658, at 282-85 (1975). This court's jurisdiction over such actions is provided by 28 U.S.C. § 1507.

[12] *See Basic Unit Ministry of Alma Karl Schurig v. Comm'r of Internal Revenue*, 670 F.2d 1210, 1213 (D.C. Cir. 1982) (per curiam); *Airlie Found. v. IRS*, 283 F. Supp. 2d 58, 61-62

capricious review.[13] The Tax Court, at various times, has appeared to weigh in on both sides of this debate.[14]

Upon analysis, this court concludes that, at least in the case of an initial qualification, *de novo* is the correct standard – that is, it is for the court, *ab initio*, to determine whether the organization in question is entitled to exemption. This view more closely tracks the statutory language, which does not require the court to review the Secretary's determination directly, but rather compels the court to make a declaration as to the qualification itself. Further evidence that the court is not reviewing the agency decision may be found in the legislative history of section 7428, which indicates that "[t]he court is to base its determination upon the reasons provided by the Internal Revenue Service in its notice to the party making the request for a determination, ***or based upon any new argument which the Service may wish to introduce at the time of the trial.***" S. Rep. No. 94-938(I), at 588 (1976) (emphasis added); *see also* H.R. Rep. No. 94-658, at 285 (1976). That defendant can raise new arguments before this court is itself indication that *de novo* review is required, as it can hardly be the case that a new theory in support of denial would be subject to arbitrary and capricious review. And defendant does not claim otherwise. Thus, both the statute and its legislative history indicate that the court is not to review the administrative decision made by the IRS and, concomitantly, suggest that *de novo* review is thus appropriate.

As defendant notes, this view is cemented by contrasting the language of section 7428 with that of since-repealed section 7477 of the Code. The latter section provided for Tax Court

---

(D.D.C. 2003); *St. Matthew Pub., Inc. v. United States*, 41 Fed. Cl. 142, 145 (1998); *Fund for the Study of Economic Growth and Tax Reform v. Internal Revenue Service*, 997 F. Supp. 15, 18 (D.D.C.), *aff'd*, 161 F.3d 755 (D.C. Cir. 1998); *Big Mama Rag, Inc. v. Comm'r of Internal Revenue*, 494 F. Supp. 473, 474-75 (D.D.C. 1979), *rev'd on other grounds*, 631 F.2d 1030 (D.C. Cir. 1980).

[13] *See Nationalist Movement v. Comm'r of Internal Revenue*, 37 F.3d 216, 219 (5th Cir. 1994) (per curiam), *cert. denied*, 513 U.S. 1192 (1995) ("Section 7428 does not provide for a trial *de novo*.").

[14] *Compare Dittler Bros., Inc. v. Comm'r of Internal Revenue*, 72 T.C. 896, 908-09 (1979), *aff'd*, 642 F.2d 1211 (5th Cir. 1981) ("de novo redetermination") *with Am. Campaign Acad. v. Comm'r of Internal Revenue,* 92 T.C. 1053, 1063 (1989) ("In making our declaration, we do not, however, engage in a de novo review of the administrative record . . . Rather, we 'base [our] determination upon the reasons provided by the Internal Revenue Service in its notice to the party making the request for a determination. . . .'") (*quoting* H.R. Rep. No. 94-658, at 285); *see also Houston Lawyer Referral Serv. Inc. v. Comm'r of Internal Revenue*, 69 T.C. 570, 573-77 (1978) ("the focus . . . is on the review of the Service's administrative determination"); *Council for Bibliographic and Info. Tech., Inc. v. Comm'r of Internal Revenue*, 63 T.C.M. (CCH) 3186, 3187 (1992) ("we do not engage in a de novo review").

review where the Commissioner had, *inter alia*, determined "that an exchange described in section 367(a)(1) is in pursuance of a" tax avoidance plan. *See* 26 U.S.C. 7477, *enacted as* § 1042(d)(1) of the Tax Reform Act of 1976, Pub. L. No. 94-455, *and repealed by* § 131(e)(1) of the Deficit Reduction Act of 1984, Pub. L. No. 98-369. Unlike section 7428, section 7477(a)(2)(A) specifically provided that, in such cases, the Tax Court's declaration should be "whether or not such determination is reasonable." The difference between these sections was underscored in *Dittler Bros., supra*, in which the Tax Court stated –

> Similarities notwithstanding, a significant difference exists between section 7477 and sections 7428 and 7476. This difference lies in the nature of the Court's review. Under section 7477, the Court is required to make a declaration as to the reasonableness of respondent's determination. In contrast, under both sections 7428 and 7476, a de novo redetermination is to be made by the Court.

72 T.C. at 908-09 (footnote omitted). In sum, the statute, the structure of comparable provisions, as well as relevant legislative history, all combine to leave the court with the firm conclusion that *de novo* is the proper standard here. *See* Gerald A. Kafka & Rita A. Cavanagh, Litigation of Federal Civil Tax Controversies ¶ 21.02[8] (2005) ("Although judicial review may be limited to the administrative record, such review is de novo."); Peter H. Winslow, T.M.P. 885-2nd: Exempt Organizations – Declaratory Judgments, at IV(A)(2) ("an organization is entitled to a de novo review of the IRS' adverse determination").

Part of the confusion surrounding the applicable standard of review in these cases may derive from the fact that review in these cases generally is based upon the administrative record generated before the IRS. *See Nonprofits' Ins. Alliance of Cal. v. United States*, 32 Fed. Cl. 277, 281 (1994); *Church of Spiritual Tech. v. United States*, 26 Cl. Ct. 713, 730 (1992), *aff'd*, 991 F.2d 812 (Fed. Cir.), *cert. denied*, 510 U.S. 870 (1993); *Easter House v. United States*, 12 Cl. Ct. 476, 482 (1987), *aff'd*, 846 F.2d 78 (Fed. Cir.), *cert. denied*, 488 U.S. 907 (1988).[15] Although, at first blush, the notion of applying *de novo* review to a static administrative record seems ill-fitted, that result springs from the legislative history of section 7428, which emphasizes the need for an applicant to provide all evidence in support of its claimed exemption to the IRS, as part of the administrative process.[16] As part of its *de novo* review, this court may render fact findings that differ from those made by the IRS in the administrative record. *See Airlie Foundation, Inc.*, 283 F. Supp. 2d at 62 & n.2. But, this is not to say that the prior qualification determination made by the Secretary is entitled to anything less than the presumption of correctness ordinarily applicable

---

[15] "Only upon a showing of good cause will a court allow a party to introduce additional evidence that was not part of the administrative record." *Easter House*, 12 Cl. Ct. at 482; *see also Unitary Mission Church v. Comm'r of Internal Revenue*, 74 T.C. 507, 515-16 (1980), *aff'd.*, 647 F.2d 163 (2d Cir. 1981). Neither of the parties has attempted to supplement the record here.

[16] *See* H.R. Rep. No. 94-658, at 287-88; S. Rep. No. 94-938, at 590-91; *see also Church of Visible Intelligence that Governs the Universe v. United States*, 4 Cl. Ct. 55, 60 (1983).

in tax refund cases and, indeed, the Secretary's formal interpretations of the statute remain entitled to appropriate deference. *See St. Matthews Pub. v. United States*, 41 Fed. Cl. at 145; *Church of Spiritual Tech.*, 26 Cl. Ct. at 729; *see also Lima Surgical Assoc., Inc. v. United States*, 944 F.2d 885, 888 (Fed. Cir. 1991); *see generally*, *Vons Cos., Inc. v. United States*, 51 Fed. Cl. 1, 7 n.5 (2001).

Another preliminary facet of this case involves whether the court may determine that plaintiff qualified for an exemption as of some date other than when its application was filed. This is an issue of first impression on which the parties vociferously disagree and which is potentially important herein because of the alleged operational changes made by plaintiff after Henkell purportedly severed his ties with NDF. While defendant argues that the court is limited to determining whether plaintiff was exempt as of the date of its application, that assertion is inconsistent with the administrative approach taken by the IRS. In this regard, Treas. Reg. § 601.201(n)(3)(i) clearly envisions that an application for exemption can be granted effective a date later than the date of the application, stating –

> A ruling or determination letter recognizing exemption is usually effective as of the date of formation of an organization, if its purposes and activities during the period prior to the date of the ruling or determination letter were consistent with the requirements for exemption. . . . If the organization is required to alter its activities or make substantive amendments to its enabling instrument, the ruling or determination letter recognizing its exemption will be effective as of the date specified therein.

*See also* Rev. Proc. 90-27, 1990-1 C. B. 514, 517-18 (restating these concepts); Rev. Proc. 80-28, 1980-1 C.B. 680, 681 (defining the process for obtaining a ruling after an organization obtains a final judicial determination that it is exempt). Logic suggests that if the Secretary must account for changes made by the applicant in deciding whether an organization is exempt, so too must a reviewing court. Were this not true, judicial review under section 7428 would take on an artificial air, that is, if such review could occur at all – the latter justiciability concern arises because section 7428 requires that there be an "actual controversy," raising questions as to whether a court could rule on the status of an organization as of the time of its application when subsequent changes had occurred. *See Nat'l Republican Found. v. Comm'r of Internal Revenue*, 55 T.C.M. (CCH) 1395, 1397 (1988) (section 7428 action dismissed where organization dissolved); Kafka & Cavanagh, ¶ 21.02[2] (section 7428(a) requires that there be an actual controversy before the court exercises jurisdiction, citing cases); *see also Baptist Hosp., Inc. v. United States*, 851 F.2d 1397, 1400-01 (Fed. Cir. 1988); *Urantia Found. v. Comm'r of Internal Revenue*, 684 F.2d 521, 523-25 (7th Cir. 1982).[17]

---

[17] This requirement, of course, is explicit in the statute, which talks of an "actual controversy." Such a requirement, of course, is also consistent with the requirements of the Declaratory Judgment Act, 28 U.S.C. § 2201, which requires that there be "a substantial controversy between parties having adverse legal interests, of sufficient immediacy and reality to

Fortunately, neither the text nor the structure of the statute suggests such an incongruous result. For one thing, section 7428(a) speaks in terms of the court issuing a declaration as to an entity's "initial qualification," a concept that presumably means the same thing in the statute as it does in the Treasury regulations. Moreover, the court finds significant that, consistent with its legislative history, the exhaustion requirement of section 7428(b)(2) has been interpreted to require compliance with all reasonable requests made by the IRS for information, including requests involving modifications made in response to IRS concerns. *See Am. New Covenant Church v. Comm'r of Internal Revenue*, 74 T.C. 293, 304 & n.11 (1980) (discussing H. R. Rep. No. 94-658, at 287-88; S. Rep. No. 94-939, at 590). Again, it would seem anomalous to construe the statute as obliging applicants to make such changes and provide supplemental information thereon, only to require reviewing courts to don blinders to the same information. Consistent with the notion that such willful blindness is neither required nor desirable, in the only case that has dealt with modifications made by an applicant after the initial application was filed, the D.C. Circuit ordered the district court, on remand, to enter summary judgment in favor of the application based upon the modifications. *See Fund for Anonymous Gifts v. Internal Revenue Service*, 83 A.F.T.R. 2d 99-1796 (D.C. Cir. 1999) (per curiam); *see also* TMP: Exempt Organizations – Declaratory Judgments at IV(F)(1) ("In initial qualification or classification cases, the courts have determined not only the exempt status of the organization but also the date upon which such status commenced."). Defendant cites nothing to the contrary. Accordingly, this court concludes that, consistent with the IRS own practice, the court may consider modifications made by an applicant in determining whether, as of some specific date, the applicant is entitled to a declaration as to its initial qualification as a tax exempt entity under section 501(c)(3) of the Code.

Finally, although it likely would make no difference in this court's ultimate conclusions, the court believes that it should address, at the outset, objections made by plaintiff to certain portions of the administrative record, especially, the copies of transcripts of seminars conducted by plaintiff's founder, Robert Henkell. In particular, plaintiff argues that this court should ignore the transcripts because they were not authenticated and are hearsay under the Federal Rules of Evidence. But, this assertion amounts to too little, too late.

For one thing, plaintiff assumes that the Federal Rules of Evidence apply here without providing any indication as to why the contents of the administrative record should be judged on that basis. To the contrary, "it has long been settled that the technical rules for the exclusion of evidence applicable in jury trials do not apply to proceedings before federal administrative agencies in the absence of a statutory requirement that such rules are to be observed." *Opp Cotton Mills, Inc. v. Admin. of Wage & Hour Div. of Dept. of Labor*, 312 U.S. 126, 155 (1941); *see also McDaniel v. Celebrezze*, 331 F.2d 426, 428-29 (4th Cir. 1964). Certainly, here, there is no requirement that the evidence rules be observed by the IRS. For one thing, those rules do not apply, of their own terms, to administrative proceedings. *See* Fed. R. Evid. 101, 1101. Nor is

---

warrant the issuance of a declaratory judgment." *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941).

their application required by more general statutes governing evidence in agency proceedings, such as the Administrative Procedure Act (APA), 5 U.S.C. §§ 551, *et seq*. The latter statute, which generally applies in administrative proceedings much more formal than those which occurred here, simply requires that evidence by qualified as "reliable, probative, and substantial," 5 U.S.C. § 556(d), and not be "irrelevant, immaterial, or unduly repetitious." *Veg-Mix, Inc. v U.S. Dept. of Agriculture*, 832 F.2d 601, 606 (D.C. Cir. 1987)); *see also Steadman v. SEC*, 450 U.S. 91, 98-100 (1981) (discussing this standard); *Richardson v. Perales*, 402 U.S. 389, 407-08 (1971) (hearsay can be considered by administrative agency and constitute substantial evidence).[18] Nor does either the Code or the Treasury Regulations require the IRS to adhere to the Federal Rules of Evidence in developing the materials that ultimately will become an administrative record.[19] The latter omission is particularly conspicuous as Congress has dictated very detailed procedures governing the IRS' handling of other tax exemption issues. *See* 26 U.S.C. § 7611 (providing detailed rules for church audits). Accordingly, there is no indication that the IRS must apply the Federal Rules of Evidence while deciding whether a given entity should be exempt.

Plaintiff, however, asseverates that because evidence rules ordinarily apply to proceedings before this court, *see* 28 U.S.C. § 2503(b), they ought to govern the content of administrative records considered by this court. Of course, if plaintiff is right, the IRS would be obliged to apply those same evidence rules derivatively, lest this court strike materials that it relied upon in denying an exemption. Taken to its logical extreme, indeed, any agency that potentially forwards administrative records to this court, or any other court that uses the Federal Rules of Evidence, would fail to apply those rules at its peril. But, contrary to plaintiff's importunings, courts generally have refused to consider collateral attacks upon the materials in administrative records based upon the *post hoc* application of evidence rules. *See, e.g., Echostar Comm. Corp. v. FCC*, 292 F.3d 749, 753 (D.C. Cir. 2002); *Brown v. Bd. of Trustees of the Bldg. Serv. 32B-J Pension Fund*, 392 F. Supp. 2d 434, 445-46 (E.D.N.Y. 2005); *Anderson v. United States*, 799 F. Supp. 1198, 1202 (C.I.T. 1992). Indeed, while this court has said that the administrative record generally does not include materials from third parties, *see Church of*

---

[18] In 1941, the Attorney General's Report that led to the passage of the APA found that applying the common law evidence rules to agency proceedings would be "inconsistent with the objectives of dispatch, elasticity, and simplicity which the administrative process is designed to promote." Admin. Proc. in Gov't Agencies: Report of the Att'y Gen's Comm. on Admin. Procedure 70-71 (1941).

[19] At the urging of both parties, this court, on April 22, 2004, issued an order requiring the administrative record to be assembled using procedures based on Tax Court Rule 210(b)(10) (which is now Tax Court rule 210(b)(12)). Notably, the latter rule also does not apply the Federal Rules of Evidence to such records. Rather, as this court noted in an order dated June 24, 2004, denying plaintiff's objection to the same materials, that rule broadly states that the administrative record should include "all written correspondence between the Internal Revenue Service and the applicant."

*Spiritual Tech. v. United States*, 18 Cl. Ct. 247, 250-51 (1989), a variety of cases have held that materials submitted by the IRS for comment by an applicant may be considered part of the administrative record in cases under section 7428.[20] The court sees no warrant to part company with these decisions, particularly given the dearth of support for plaintiff's position.

Finally, to the extent that the Federal Rules of Evidence may be viewed as applying here, *see Animal Protection Institute, Inc. v. United States*, 1978 WL 4201 at * 7(Ct. Cl. Trial. Div. 1978), it is noteworthy that under Rule 803(8)(C), public records and reports setting forth "factual findings resulting from an investigation made pursuant to authority granted by law" are admissible, despite being hearsay, unless "the sources of information or other circumstances indicate lack of trustworthiness." Fed. R. Evid. 803(8)(C). This rule has been construed to allow the admission of what might otherwise be considered hearsay materials as part of an administrative record. *See*, *e.g*., *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169-70 (1988); *Schaefer v. United States*, 633 F.2d 945, 952 (Ct. Cl. 1980). In an appropriate setting, others of the statements to which plaintiff objects plainly would constitute admissions by a party-opponent. Fed. R. Evid. 801(d)(2). Moreover, the circumstances here hardly indicate a lack of trustworthiness – far from it. Two (albeit not all) of the seminar transcripts are certified,[21] as is the administrative record itself, and more importantly, the critical statements made in the transcripts are consistent with those made in a host of other documents in the record, including NDF's own promotional materials. Moreover, neither before the IRS, the district court in *Estate Preservation Services*, or this court, has plaintiff ever fleshed out its bare bones objections with any affirmative evidence that undercut the authenticity of the challenged documents, including any form of a denial from Henkell. On the record as a whole, this court likely would have admitted the particular statements in question as authentic and as covered by the residual exception to the hearsay under Rules 901(a) and 807 of the Federal Rules of Evidence,

---

[20] *See, e.g., Airlie Foundation, Inc. v. United States*, 92-2 USTC ¶ 50,462 at * 2-3 (D.D.C. 1992) (accepting as part of the administrative record grand jury transcripts and other materials relating to the criminal prosecution of organization's founder where IRS had relied upon those materials and applicant had been given a chance to respond thereto); *Church of Ethereal Joy v. Comm'r of Internal Revenue*, 83 T.C. 20, 24-26 (1984) (same result as to articles and advertisements submitted by the IRS to the applicant for comment); *see also First Libertarian Church v. Comm'r of Internal Revenue*, 74 T.C. 396, 398-99 (1980) (considering such materials, but allowing the applicant to respond because it had not previously had an opportunity to do so); TMP: Exempt Organizations – Declaratory Judgment at V(D)(1)(f) ("Although the administrative record generally does not include 'third-party materials,' the IRS can cause such items to be made part of the administrative record by sending copies to the organization during the administrative process and asking for comments.").

[21] Notably, the two transcripts on which the certification was prepared but not signed were prepared by the same reporter who certified the other transcripts in the record – making it very likely that the failure to sign the certifications in the two instances was inadvertent. Moreover, as noted above, when originally presented with the two unsigned transcripts, NDF readily acknowledged that they were of an EPS seminar conducted by Mr. Henkell in 1996.

respectively. *See Airlie Found. v. United States*, 826 F.Supp. 537, 546 (D.D.C. 1993), *aff'd*, 55 F.3d 684 (D.C. Cir. 1995).[22]

With these preliminary matters resolved, the court now turns to the core question whether plaintiff is, in fact, entitled to a declaration.

**B. Was NDF entitled to tax exempt status?**

We begin with common ground. Exemptions from income tax are matters of legislative grace which the courts have consistently construed strictly. *See Trustees of the Graceland Cemetery Improvement Fund v. United States*, 515 F.2d 763, 770 (Ct. Cl. 1975); *see also Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 643 n.2 (1980). Under section 501(c)(3) of the Code, an organization is entitled to federal tax exemption if, *inter alia*, it is "organized and operated exclusively for religious, charitable. . . or educational purposes, . . . no part of the net earnings of which inures to the benefit of any private shareholder or individual." Failure to satisfy any of these requirements results in an organization being disqualified from tax exemption. *See Easter House*, 12 Cl. Ct. at 483 ("Because the requirements are stated in the conjunctive they *all* must be met." (emphasis in original)). The burden is on the applicant to establish that it meets these statutory requirements. *See IHC Health Plans, Inc. v. Comm'r of Internal Revenue*, 325 F.3d 1188, 1193 (10th Cir. 2003); *Geisinger Health Plan v. Comm'r of Internal Revenue*, 985 F. 2d 1210, 1214 (3d Cir. 1993); *Living Faith, Inc. v. Comm'r of Internal Revenue*, 950 F.2d 365, 370 (7th Cir. 1991); *Basic Unit Ministry*, 670 F.2d at 1211.[23]

---

[22] Plaintiff likewise errs in suggesting that Henkell's statements should be disregarded because they were made before NDF was formed in May of 1996. Two of the transcripts are of seminars that, in fact, occurred in March of 1997. While the other two transcripts in the record are of seminars that occurred in late April of 1996, the court sees no basis for ignoring statements made by NDF's founder within a few weeks of its formation. As will be discussed in greater detail below, these documents clearly shed light on the true purposes underlying plaintiff's operations.

[23] The legislative history of section 7428 indicates that "burden-of-proof rules are to be developed by the courts under their rule-making powers," indicating further that "[i]nsofar as is practical, those rules should conform to the rules that the Tax Court develops with regard to declaratory judgment suits as to retirement plans, under section 7476." S. Rep. 94-938(I), at 588; *see also* Staff of Joint Comm. on Taxation, General Explanation of the Tax Reform Act of 1976 (1976), 1976-3 C.B. (Vol. 2) 1, 415. This court's rules, however, do not provide any guidance as to burden of proof in these case and instead simply state that "[t]he procedure for obtaining a declaratory judgment pursuant to 28 U.S.C. §§ 1491(b)(2) and 1507 shall be in accordance with these rules." RCFC 57. In the absence of rulemaking, several cases have suggested that this court somehow is bound to follow the practice of the Tax Court, with one citing cases for the proposition "that Congress expected the Claims Court and the district courts to follow the practices of the Tax Court." *Church of Spiritual Tech. v. United States*, 20 Cl. Ct. 762, 764 (1990) (citing *Church of Spiritual Tech.*, 18 Cl. Ct. at 250); *see also St. Matthew Pub., Inc.*, 41

Looking to the first requisite for exemption, an organization must be both "organized and operated exclusively" for one or more exempt purposes. If an organization fails to meet either prong, it cannot be exempt under section 503(c)(1). Treas. Reg. § 1.501(c)(3)-1(a)(1); *Am. Ass'n of Christian Schs Voluntary Employees Beneficiary Ass'n Welfare Trust Plan v. United States*, 850 F.2d 1510, 1513 (11th Cir. 1988). "Exclusively" in this statutory context is a term of art and does not mean "solely." *See Easter House*, 12 Cl. Ct. at 483. Rather, an organization is "operated exclusively" for exempt purposes if it engages in primarily exempt activities. *Id*. If, however, the organization's activities involve substantially non-exempt purposes, no tax exemption applies. *Id*.; *Am. Ass'n of Christian Schools*, 850 F.2d at 1513. In this regard, it is well-settled that an "incidental non-exempt purpose will not disqualify an organization, but a single substantial non-exempt purpose or activity will destroy the exemption, regardless of the number or quality of exempt purposes." *Airlie*, 826 F. Supp. at 549 (*citing Better Bus. Bureau v. United States*, 326 U.S. 279, 283 (1945)); *see also Scripture Press Foundation v. United States*, 285 F.2d 800, 806 (Ct. Cl. 1961); *Am. Campaign Acad. v. Comm'r of Internal Revenue*, 92 T.C. 1053, 1065 (1989).[24] On the other hand, an organization does not operate exclusively for tax-exempt purposes if it serves a private rather than a public interest. *Easter House*, 12 Cl. Ct. at 487; *see also* Treas. Reg. § 1.501(c)(3)-1(d)(1)(ii).

In the case *sub judice*, there is not much debate that NDF was organized exclusively for exempt purposes – its articles of incorporations and bylaws repeat, virtually in *haec verba*, the flush language of section 501(c)(3). But, was NDF operated exclusively for exempt purposes? That is a question of fact to be resolved on the basis of the administrative record. *See Lapham Founds. v. Comm'r of Internal Revenue*, 389 F.3d 606, 610 (6th Cir. 2004); *Living Faith, Inc.*, 950 F.2d at 371; *Church by Mail, Inc. v. Comm'r of Internal Revenue*, 765 F.2d 1387, 1390 (9th Cir. 1985). "[T]he critical inquiry under the operational test," this court has stated, is on the "'purposes towards which an organization's activities are directed.'" *Nonprofits Ins. Alliance of Cal.*, 32 Fed. Cl. at 283 (*quoting B.S.W. Group, Inc. v. Comm'r of Internal Revenue*, 70 T.C. 352, 356-57 (1978)). Other cases emphasize that the focus is "on the actual purposes the organization

---

Fed. Cl. at 145; *NonProfits' Ins. Alliance of Cal.*, 32 Fed. Cl. at 281-82. But, setting apart whether Congress could effectuate this result by legislative history alone, no reading of the actual language of the relevant reports supports the notion that this court is compelled to adopt – *ad hoc*, wholesale and out of context – the Tax Court's rules in declaratory judgment actions, as amended over time. Nonetheless, as there appears to be no dispute here that the burden is on plaintiff to demonstrate its entitlement to the claimed exemption under the grounds that were put in issue by the IRS during the administrative process, this court need not resolve the extent to which the Tax Court's rules should impact a declaratory judgment proceeding in this court.

[24] In this regard, Treas. Reg. § 1.501(c)(3)-1(c)(1) states that "[a]n organization will be regarded as operated exclusively for one or more exempt purposes only if it engages primarily in activities which accomplish one or more of such exempt purposes specified in section 501(c)(3)," but will "not be so regarded if more than an insubstantial part of its activities is not in furtherance of an exempt purpose."

advances by means of its activities, rather than on the organization's statement of purpose." *Redlands Surgical Servs. v. Comm'r of Internal Revenue*, 113 T.C. 47, 71 (1999), *aff'd*, 242 F.3d 904 (9th Cir. 2001) (per curiam); *see also Am. Campaign Acad.*, 92 T.C. at 1064 (the court must look beyond "the four corners of the organization's charter to discover the actual objects motivating [it]"). As noted by the Third Circuit, "[a]ny exploration of unarticulated or illicit purpose necessarily involves courts in difficult and murky problems." *Presbyterian & Reformed Pub. Co. v. Comm'r of Internal Revenue*, 743 F.2d 148, 155 (3d Cir. 1984). Cases involving claims of hidden nonexempt purposes have focused on the manner in which the operations themselves are conducted, implicitly reasoning that "an end can be inferred from the chosen means." *Id*. (quoting record of Tax Court proceeding below); *see also Nonprofits Ins. Alliance of Cal*., 32 Fed. Cl. at 283; *Living Faith*, 950 F.2d at 372 (citing cases); *Universal Life Church, Inc. v. United States*, 13 Cl. Ct. 567, 583 (1987), *aff'd*, 862 F.2d 321 (Fed. Cir. 1988). The court will adopt that approach here.

Defendant claims that NDF has never operated appropriately, asserting that its operations have always been motivated by an intent to facilitate the abuse of the internal revenue laws. There is significant evidence in the record supporting this claim, beginning first with NDF's operations prior to the modifications allegedly made in 1997 and 1998. From the start, NDF's promotional materials revealed that it was designed to "warehouse wealth," that is, to allow donors to "contribute" property and cash to their foundations, control the investment of those resources and then assertedly have the income and appreciation on that corpus accrue or be realized tax-free. Any notion that those funds were to be dedicated solely to charitable purposes is belied by repeated representations that the foundations could be used "to warehouse income for long range planning and wealth accumulation," "to eliminate estate taxes," for "capital gains avoidance," to pass life insurance proceeds to children, and as a "very powerful long range planning device to establish, tax-free, a nest egg that can provide retirement benefits."[25] As plaintiff's founder touted, the foundations were advertised as being better than IRAs because there were few, if any, real limitations on money being withdrawn by the donor, at any time. NDF's promotional materials, indeed, indicated that the individual foundations could "benefit the Donor or the Donor's family," and gave, as examples, the ability to pay children salaries for performing charitable work, to pay "administrative expenses" that included travel expenses for foundation meeting, or to pay the donor or his family a "a fee or wage to attend a meeting or to 'research' an investment."

To be sure, some of the money contributed to the foundations eventually wended its way to recognized tax-exempt organizations – but in NDF's first year of operation, such donations accounted for less than 5 percent of the money contributed. That said, the record, as a whole, demonstrates that, in the main, NDF and its Board strained, beyond any recognition, the concept of charity in approving personal expenditures.

---

[25] While the above quotes come from particular promotional materials, the messages conveyed thereby are leitmotifs repeated throughout the record and, in particular, are not limited to statements made by Henkell during his various seminars.

As detailed in this court's fact findings, those expenditures covered such things as travel by donors to various retreats and conferences, including training seminars run by Henkell and his affiliated organizations. They also reimbursed donors and members of advisory boards for their meals and entertainment expenses and those of others, in one memorable instance covering the costs of aunt to visit her niece and nephew. In many other instances, NDF approved expenditures to cover administrative expenses, fundraising and the salary of "consultants" without any indication that those expenses actually were needed, let alone reasonable. Moreover, if NDF's promotional materials are to be believed, these documented abuses were only the tip of the iceberg. NDF, Henkell and the various "fundraisers" advertised that funds contributed to foundations could be used not only to supplement retirement income or to deal with a family emergency, but also for such personal expenses as providing scholarships to children or wages to family members who "volunteered" services. These same promotions suggest that, in other instances, NDF approved major expenditures that were only incidentally related to providing charitable services, with the $147,000 motor home apparently purchased by a doctor providing occasional medical services providing a flavor of what occurred. And, in still other instances, it appears that NDF encouraged donors to reformulate their requests to disguise the true nature of the expenditures involved. Accordingly, the record pervasively demonstrates that, at least initially, NDF served significant non-exempt purposes that focused primarily on providing personal, rather than public, benefits. *See Am. Campaign Acad.*, 92 T.C. at 1065 ("When an organization operates for the benefit of private interests such as designated individuals, the creator or his family, shareholders of the organization, or persons controlled, directly or indirectly, by such private interests, the organization by definition does not operate exclusively for exempt purposes.").[26]

Plaintiff, of course, argues that it underwent a "road-to-Damascus" conversion upon the departure of its founder, Robert Henkell. But, one can only greet with skepticism the notion that an organization which raised millions of dollars from donors based upon promises of "warehousing wealth" could, without violating its prior agreements, radically alter its policies. Such radical conversions, of course, do occur in life – but, not on this record.

Instead, the record indicates that Henkell continued to impact significantly, if not control, the operations of NDF after his departure. NDF's claim that it severed ties with its founder are belied by records indicating that it continued to make payments to the array of trusts, corporations and partnerships that he controlled and by the fact that the new NDF Board was dominated by individuals who were intimately involved in Henkell's other ventures. For

---

[26] As noted by the Tax Court, "[t]he proscription against private benefit shares common elements with, but is distinct from, the proscription against the inurement of organizational earnings to private shareholders and individuals, as contained in section 501(c)(3) and sections 1.501(a)-1(c) and 1.501(c)(3)-1(c)(2), Income Tax Regs." *Redlands Surgical Servs.*, 113 T.C. at 74. Unlike inurement, however, the proscription against private benefits encompasses benefits conferred on individuals not viewed as shareholders or insiders of the alleged tax exempt entity. *Id*; *see also Am. Campaign Acad.*, 92 T.C. at 1066-69.

example, Sainsbury, who eventually became the Chairman of NDF's Board and its President, admitted that in other instances, he had merely posed as the figurehead of businesses that were actually controlled by Henkell. And even if Henkell no longer directly impacted NDF, there is no real indication that NDF truly changed its stripes. While plaintiff asserts that it made major changes in its promotional materials, the record suggests that the newer versions thereof that it provided to the IRS were not always employed in recruiting additional "donors." Finally, while in the face of a likely IRS adverse ruling, NDF produced resolutions suggesting that certain practices, *e.g.*, the use of advisory committees, were to be discontinued, the court is more struck by the absence of anything in the record indicating what forms of governance replaced those earlier practices and whether those modifications were ever communicated to existing donors, let alone made effective – certainly, not enough specificity to allow the court to determine a date certain upon which plaintiff would be entitled to receive a tax-exemption. In short, the record does not support the notion that Henkell's departure (or any other event) fundamentally altered NDF's cold calculus of self-interest.

If plaintiff had evidence that contradicted these findings – and, if its conversion claims are *bona fide*, it ***should*** have this evidence – it should have brought that material forth as part of the administrative process to satisfy its burden of demonstrating its entitlement to an exemption. It is well-accepted that, in initial qualification cases such as this, gaps in the administrative record are resolved against the applicant. As noted by the Seventh Circuit, "[c]ourts can draw inferences adverse to a taxpayer seeking exempt status where the taxpayer fails to provide evidence concerning its operations, or where the evidence is vague or inconclusive." *Kile v. Comm'r of Internal Revenue*, 739 F.2d 265, 269 n.5 (7th Cir. 1984). Numerous other 7482 cases in this court and elsewhere are to similar effect.[27] This rule, of course, accords with the evidentiary presumptions ordinarily applicable in civil cases, including cases involving records formed before administrative agencies, at least where the party with the burden of proof also controls the relevant evidence.[28] While such an adverse inference generally is more a "product of

---

[27] *Church of Spiritual Tech*, 18 Cl. Ct. at 250 (The applicant "must put into the record sufficient materials to warrant the grant of tax exempt status. If the record compiled ***lacks*** sufficient support to reach that conclusion, [the applicant] is responsible for the deficiency." (emphasis supplied)); *St. John's Orphanage, Inc. v. United States*, 16 Cl. Ct. 299, 303 (1989) ("all insufficient or contradictory evidence must be resolved against the plaintiff."); *see also Am. Campaign Acad.*, 92 T.C. at 1072; *La Verdad v. Comm'r of Internal Revenue*, 82 T.C. 215, 219 (1994); *Schager Found. v. Comm'r of Internal Revenue*, 76 T.C. 380, 388 (1981); *Gen. Conf. of the Free Church of Am. v. Comm'r of Internal Revenue*, 71 T.C. 920, 931-32 (1979); *see generally*, TMP: Exempt Organizations – Declaratory Judgment at V(A)(C) ("Because the organization carries the burden of proof, all insufficient or contradictory evidence in the administrative record must be resolved against the organization.").

[28] *See, e.g., Interstate Circuit v. United States*, 306 U.S. 208, 226 (1939) ("The production of weak evidence when strong is available can lead only to the conclusion that the strong would have been adverse. Silence then becomes evidence of the most convincing

common sense than of the common law," *International Union (UAW) v. NLRB*, 459 F.2d 1329, 1335 (D.C. Cir. 1972), here, it derives added support from the statute itself, which emphasizes the need for a taxpayer to exhaust its administrative remedies as a precursor to suit. For this court to not weigh gaps against plaintiff "would be to encourage [taxpayers] to play a tight-lipped form of 'cat and mouse' with [IRS] information requests – gamesmanship that makes no sense generally and particularly not in the confines of the explicit and implicit directions" of the Code. *Int'l Outsourcing Servs., LLC v. United States*, 69 Fed. Cl. 40, 51 (2005); *see also Houston Lawyer Referral Serv.*, 69 T.C. at 574.[29]

Accordingly, the court finds that during all the periods in question, NDF failed to operate exclusively for exempt purposes. The pattern revealed by the record indicates that NDF's operations and, in particular, it supervision of donor foundations, was characterized at the least by willful neglect, and, more than likely, an active willingness to participate in a scheme designed to produce inappropriate tax benefits. This finding alone warrants this court's denial of the relief claimed by plaintiff under section 501(c)(3) of the Code.
.

Seeking to counter the foregoing, plaintiff claims that it is a "donor-advised fund" of the sort held exempt by this court in *National Found., Inc. v. United States*, 13 Cl. Ct. 486 (1987) (*NFI)*. To be sure, in *NFI*, as here, portions of the moneys donated by individuals were contributed to other qualified organizations, and the corporation also initiated, funded and administered various allegedly charitable projects. But, at this point, the commonality between the two cases ceases. For one thing, this court, in *NFI*, was heavily influenced by its view that the NFI Board of Directors exercised effective control to ensure that the individual expenditures authorized were for exempt, not personal, purposes. In this regard, it commented that –

> The NFI Board of Directors will refuse to initiate a project unless the project meets five stringent standards. The project must be consistent with the charitable purposes allowed by the Internal Revenue Service, must have a reasonable budget, must be adequately funded, must be staffed by competent, well-trained personnel, and must be capable of effective monitoring and supervision by NFI.

*Id*. at 492. By comparison, there is no indication in the case *sub judice,* that plaintiff had, let alone enforced, a comparable set of standards – a strong indication, in this court's view, that it

---

character." (internal citations omitted)); *Cavalier Clothes, Inc. v. United States*, 51 Fed. Cl. 399, 420 & n.28 (2001). Likewise, vague generalizations and conclusory expectations are insufficient to demonstrate that the applicant meets the operational test. *See, e.g., Church in Boston v. Comm'r of Internal Revenue*, 71 T.C. 102, 106-07 (1978).

[29] Notably, nothing prevents plaintiff from supplying information demonstrating that it has truly changed its approach as part of a new application for exemption.

was not serious about preventing the abuses of its funds.[30] Moreover, in *NFI*, the record apparently was "replete with convincing evidence that donors relinquish all ownership and custody of the donated funds or property." *Id*. at 493. Here, both the promotional materials advertising how NDF would be run, as well as the actual pattern of investment and expenditure decisions made, suggest that the donors in question did not truly relinquish ownership and control over the donated funds and property. Rather, they were allowed to treat NDF as a conduit for accomplishing the twin tax avoidance goals of building up their assets tax-free and then siphoning off the accumulated wealth to pay for personal expenditures. Hence, assuming *arguendo* that *NFI* was correctly decided – an issue this court need not reach – that case avails plaintiff naught.

## III. CONCLUSION

This court need go no further.[31] As John Adams once said during the trial that propelled him to prominence, "[f]acts are stubborn things; and whatever may be our wishes, our inclinations, or the dictates of our passion, they cannot alter the state of facts and evidence." Here, while plaintiff complains of the "bluster" in defendant's briefs, it never really comes to grip with the essential state of the facts and the evidence. Those facts stubbornly demonstrate – indeed, rather thoroughly – that plaintiff is not entitled to the tax exemption it claims. This is not because of any vendetta against its founder, but because of the course of operations upon which NDF actually embarked – a course that plainly was designed, *ab initio*, to accomplish a significant nonexempt purpose in "warehousing wealth" and one from which it apparently did not deviate significantly after its founder relinquished titular control.

Based on the foregoing, the IRS properly determined that plaintiff does not qualify for tax-exempt status under section 501(c)(3) of the Code. The Clerk shall enter judgment dismissing the complaint.

**IT IS SO ORDERED**.

s/ Francis M. Allegra
Francis M. Allegra
Judge

---

[30] *See Church in Boston*, 71 T.C. at 107 ("failure to develop criteria for disbursement of grants or to keep adequate records . . . can result in abuse."); *Senior Citizens of Mo., Inc. v. Comm'r of Internal Revenue*, 56 T.C.M. (CCH) 480, 482 (1988) (While "[m]aintaining adequate records and developing criteria for the disbursement of funds, for both exempt and nonexempt purposes, may appear onerous to a fledgling organization," such compliance "is necessary to safeguard against the potential abuse of the organization's funds.").

[31] In particular, based upon the foregoing, this court need not reach defendant's assertion that plaintiff was not entitled to a tax exemption because of private inurement.